The undersigned have reviewed the prior Opinion and Award of Deputy Commission Lawrence B. Shuping, Jr. and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; or to amend the Opinion and Award
EVIDENTIARY RULING
For the reasons stated in the following Findings of Fact, plaintiff's objection to the results of the blood alcohol and drug screening tests are overrule. State v. Miller, 80 N.C. App. 425,342 S.E.2d 553 (1986).
* * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
Prior to the initial hearing before Deputy Commissioner Shuping, the parties entered into a Pre-Trial Agreement, which is hereby incorporated by reference as if fully set out herein and which contains a number of jurisdictional and other factual stipulations.
* * * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff is a thirty-three year-old married male with two minor children. He was educated through the tenth grade, but subsequently obtained his GED or high school equivalency certificate.
2. Plaintiff began working full-time at age sixteen and has primarily been employed in the construction trade. Since 1977 he has done steel work. Although he started out tying in concrete reinforcing rebar, plaintiff thereafter became involved in structural steel work, both on the ground and as a connector above ground, responsible for bolting together vertical steel columns and horizontal beams delivered to him by crane suspended from a cable.
3. In approximately 1985 or 1986 plaintiff became employed in the latter capacity by defendant C.P. Buckner Steel Erection and at the time of his injury on 4 May 1992 was employed there as a connector regularly requiring him to work above ground.
Although defendant-employer's safety rules required its employees to tie in with safety belts and lanyards anytime they worked above six feet; connectors were exempt from the rule because of the need to be able to freely move and avoid pieces of steel being delivered to them by crane.
4. Plaintiff began drinking at age sixteen and at the time of his injury was a chronic alcoholic not only accustomed to drinking heavily every weekend, but one who drank on a daily basis, including workdays as he admits doing on 4 May 1992.
On a typical weekend plaintiff would drink from the time he got up in the morning until he went to bed at night, and would consume as much as a half gallon of liquor (80 proof Jim Beam) and two six packs or more of beer. During the work week plaintiff would not only drink at night after he got off work, but on occasion would drink a couple of beers in the morning before going to work as well as at lunch. Plaintiff also kept a bottle of liquor in his truck at work and on occasion would go out to his truck during breaks to take a drink, which the Full Commission reasonably infers was the principal reason for plaintiff's trips to his vehicle during the workday.
5. Although plaintiff was a chronic alcoholic, he was a functional one who had developed a high tolerance to the effects of alcohol and could consume large amounts without being noticeably impaired. In fact, without alcohol he could not function as evidenced by the delirium tremens plaintiff developed after he had fallen on 4 May 1992 and stopped drinking. However, with alcohol he could and had been functioning, doing steel work since 1977 during the most recent four or five years necessarily requiring coordination, balance and dexterity to enable him to work on narrow steel I-Beams above ground. This was particularly true while wearing his sixty-five to seventy pound toolbelt and bolt bags when worn without having to tie in by safety belt and lanyard, which, for the reason previously stated, connectors were exempt from, and had been able to walk the same steel beams without incident notwithstanding defendant-employer's rule prohibiting beam walking.
In the course of his work plaintiff was also required to wear two bolt bags containing the bolts used in connecting beams and columns and a toolbelt with two spread wrenches that hung down to knee level and a spud bar that hung halfway down his calf among other tools, which altogether weighed in the 65 to 70 pound range.
6. According to his supervisor, Richard Bowers, plaintiff was the top worker on his crew, who was generally on time to work and had no problems carrying out his assignment. Also, according to Mr. Bowers plaintiff acted no differently on the date in question as compared to any other day, and he saw nothing to indicate plaintiff was impaired in anyway. Additionally, George Reynolds and Merle Locklear worked with plaintiff from 7:00 a.m. to 4:00 p.m. and neither noticed anything unusual about plaintiff's behavior nor any indication he was impaired.
7. When plaintiff was initially examined in the Emergency Room at Duke University Medical Center on 4 May 1992 he was alert and oriented and there were no entries by any of the medical providers or personnel involved in examining him indicating any symptoms of intoxication. Rather, the only evidence of alcohol in the record are the disputed results of the trauma drug screen that all major trauma patients similarly underwent as part of the hospital's protocol as well as the fact that plaintiff subsequently developed delirium tremens from alcohol withdrawal the next day because he was a chronic alcoholic, which is not disputed.
8. At approximately 7:00 a.m. the morning of 4 May 1992 plaintiff had reported to work at the construction site at Research Triangle Park and without incident up until lunch time assisted in the placement of needed metal decking in the building, which was being moved by the crane defendant-employer had rented. Plaintiff then took a half an hour lunch break at 12:00 p.m. and drove his truck to a convenience store six miles from the job site where he had something to eat and admits to consuming two sixteen ounce Budweisers.
9. After lunch plaintiff and another connector, Merle Locklear, began connecting the vertical columns and horizontal beams. These beams were delivered to them suspended by cable from the same rental crane and had to be lifted over an approximate twenty foot high masonry wall located immediately adjacent to the steel frame work they were erecting.
10. At the particular time in question that afternoon plaintiff and Merle Locklear were involved in connecting a specially fabricated horizontal beam identified by capital (A) in Plaintiff's Exhibit Number 2, which is a photograph of the scene. The fabricated beam was of unusual construction because another beam had been welded on top of it along the approximate eleven foot section of the beam in front of the masonry wall, which ran from the vertical column to which it was to be connected, identified by capital (B) in Plaintiff's Exhibit Number 2, to the end of the welded beam, identified by capital (D) in the same Exhibit, where there was a resulting eight inch drop off. The beam then extended for a little more than ten feet where it was Z-welded to another beam to accommodate for the difference in the building's floor level, and then on to another beam to which it was ultimately to be connected.
11. The above described beam was delivered over the masonry wall by crane suspended by cable and choker to plaintiff and Merle Locklear and they initially connected the back end of the beam closest to the Z-weld, at which time the front end of the beam had to be connected to the vertical column identified by capital (B) in Plaintiff's Exhibit Number 2.
12. Although with the knowledge of his supervisor plaintiff had walked beams in violation of defendant-employer's safety policy. The safety policy required the cooning of beams by straddling them with a worker's feet on a lower flange and his hands on an upper flange. In the area of the concrete masonry wall, where the second beam was welded to the primary one, there was not enough space between the masonry wall and beam to coon the beam in a normal fashion and also be able to reach the point where it had to be connected with the vertical column identified by a capital (B) on Plaintiff's Exhibit Number 2.
13. Although plaintiff could have used the ladder shown in the last mentioned Exhibit or the modified type of cooning described of record; he instead chose to walk the beam in the area of the masonry wall by placing his back against the masonry wall, walking sideways to the point where the beam was to be connected with the vertical column. Plaintiff acknowledges this was a "hairy" and dangerous situation because there was nothing to hold on to and it was difficult to get balanced. However, plaintiff was nonetheless able to reach the intersection of Column (B) and Beam (A) and connect them. After connecting the two plaintiff walked back toward the other end of the beam, disconnected the choker by which it had been delivered by crane and them returned to the area at the other end of the beam where Merle Locklear was located.
14. The next beam in the sequence to be connected was the one running perpendicularly from the intersection of Column (B) and Beam (A) requiring either plaintiff or Merle Locklear to return to the same intersection to connect them. Because Mr. Locklear was not comfortable crossing the beam the first time a connection had to be made at the same intersection, and because he had to walk sideways cross the beam with his back against the masonry wall to make that connection, plaintiff agreed to connect the next beam. In route, plaintiff inexplicably fell, landing on the ground in the area immediately below point (D) in Plaintiff's Exhibit Number 2 where there was an approximate eight inch difference between the main beam and the one welded on top of it in front of the masonry wall. As a result of the fall, plaintiff sustained a C-6 cervical fracture with resulting quadriplegia and thereby the otherwise compensable neck injury giving rise hereto.
Although he has since experienced some improvement in the muscle strength of his right arm, plaintiff has not reached maximum medical improvement and based on similar spinal injuries will not for at least two years thereafter. In the interim he remains totally incapacitated from working and will for the foreseeable future.
15. Although at the time of falling plaintiff did have an elevated blood alcohol level in the range of .15 to .20 and had smoked marijuana in the recent past, as indicated by the results of the disputed trauma drug screen he underwent at Duke University Medical Center as well as his own testimony, neither intoxication nor being under the influence of marijuana was one of the proximate causes of his fall and resulting injury on 4 May 1992. In fact the positive test results for cannabinoids (or THC) in the blood from prior marijuana use provides no scientific basis for showing that plaintiff was anyway under the influence of or impaired by the same substance when he fell nor is there any other evidence that he was.
16. Within an hour of his fall plaintiff arrived at the Emergency Room of Duke University Medical Center. There, plaintiff came under the care of one of the premises trauma teams consisting of the senior surgical resident, Dr. John Michael DiMaio, junior resident, general surgeon in charge, a respiratory therapist, primary nurse and a couple of assistant nurses and was taken to a resuscitation room where he was the only patient.
17. In cases of all major trauma as part of the hospital's standard Advanced Trauma Life Support protocol the senior resident in charge, Dr. DiMaio, ordered a trauma drug screen and, as he similarly would with any major trauma patient, relied on the results of the same test in the course of diagnosing and treating plaintiff's injuries on this occasion.
18. Based not only on the fact that the trauma drug screen was ordered solely for the purpose of diagnosis and treatment and the physicians treating plaintiff relied on this test in their diagnosis and treatment, but also because the machine used in blood alcohol testing was a scientifically reliable one capable of producing an accurate and reliable blood alcohol test and was properly calibrated and had proper controls run on it prior to testing plaintiff's serum blood sample according to the manufacturers standard protocol, the blood test results obtained were inherently trustworthy and the 181 milligram per deciliter reading, or .18 level of blood alcohol on testing is certainly consistent with plaintiff being a chronic, but functional alcoholic, who consumed large amounts of alcohol on a daily basis and had been drinking that day, including at work.
Further, there is no reason to raise any suspicion about the reliability of the results of the drug trauma screen or that the sample used was that of anyone other than plaintiff's. Standard hospital protocol was strictly followed in obtaining, labeling, transporting and testing his blood sample thereby establishing the requisite chain of custody necessary to insure that fact.
19. According to the hospital's standard protocol in similar cases of major trauma, the senior resident in charge of the trauma team, Dr. DiMaio on this case ordered the trauma drug screen at 5:00 p.m. following plaintiff's arrival at the Emergency Room only minutes before and placement in the resuscitation room for treatment. According to the same protocol, the junior resident, Dr. Jim Dalton on this occasion, was positioned to plaintiff's left side and would draw a blood sample from the fernoral vein in his groin area, which was prepped with Betadine solution not alcohol, the resulting sample was placed in vacuum tubes that were part of a blood draw kit and if their seal was anyway broken or compromised a valid test could not be run, the primary nurse would act as a scribe by making a label from a label gun maintained in the Emergency Room area and place the same label with the patient's name and history number on the tubes to be tested, at which time a nursing assistant would take the tubes of blood needing testing to a clerk in the Emergency Room area, who would enter a requisition in the computer requesting the necessary testing, the clerk would then place the labeled tubes in a zip-lock bags and together with a requisition order they would be sent by a pneumatic tube to the laboratory for testing. Once the sample arrived in the laboratory a processor would assign it an accession number, the blood would then be spun down on a centrifuge to obtain the needed blood serum for testing and the blood serum would subsequently be tested a trained and certified laboratory technician, who was Vicki Bauguess on this occasion, and upon testing the sample on the machine used to do so, which, as aforesaid, had been properly calibrated earlier and had undergone proper control testing that day, would call in the results to the Emergency Room because they were needed "stat" and also would enter them into the hospital's computer system where they became part of the patient's permanent record.
* * * * * * * * * * * *
Based upon the findings of fact, The Full Commission Concludes as follows:
CONCLUSIONS OF LAW
1. On 4 May 1992 Plaintiff sustained an injury by accident arising out of and in the course of his employment when he fell sustaining a fracture of the C-6 vertebrae with resulting quadriplegia. Although he has since experienced some improvement in the muscle strength of his right arm, Plaintiff has not yet reached maximum medical improvement and in the case of spinal cord injuries will not for at least two years form the date of injury. In the interim, Plaintiff remains totally incapacitated as a result of his injury and will for the foreseeable future.
2. Neither intoxication nor his being under the influence of a controlled substance, marijuana, was a proximate cause of plaintiff's fall and resulting injury on the date in question. N.C. Gen. Stat. § 97-12 (1) (2).
* * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, The Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay plaintiff, on account of his continuing total disability, compensation at a rate of $299.67 per week from 4 May 1992 to the scheduled date of the initial hearing and thereafter continuing at the same rate so long as he remains totally disabled, subject to a change of condition or employment.
2. At this time a reasonable attorney fee in the amount of twenty-five (25) percent of the accrued compensation benefits due under the above award is hereby approved for plaintiff's counsel, which shall be deducted from the same award and forwarded directly thereto.
3. To the extent the same are reasonably designed to tend to effect a cure of, provide needed relief from and/or lessen the period of disability associated therewith, defendants shall pay all reasonable and necessary medical expenses incurred by plaintiff as a result of the injury by accident giving rise hereto when bills for the same are submitted on proper forms, through defendant-carrier, to the Industrial Commission for approval and are approved by the Commission.
4. Defendants shall bear the cost.
* * * * * * * * * *
It should not come as a surprise that some persons area able to consume alcohol on a daily basis and still be able to function as well if not better than other persons who consume no alcohol.
Abraham Lincoln was confronted by detractors of General Ulysses S. Grant with taunts that Grant was a drunkard. Yet, because of Grant's superior record on the battlefield at the same time that Grant's detractors were accusing him of being hopelessly drunk, Lincoln's rely was "If I knew what brand of whisky he drinks I would send a barrel or so to some other generals."
One of the best versions of these legend is contained in Mr. Lincoln's General U.S. Grant, by Roy Meredith, E.P. Dutton and Company, Inc., New York, 1959, as follows:
 ". . . word had also reached the president about Grant's drinking at headquarters, and Mr. Lincoln wanted to know more about this general who had a habit of winning victories and who, according to reports, was a habitual drinker. Grant's jealous enemies had made the most of a minor weakness and had expanded it out of all proportions. They pressured Lincoln into removing Grant from his command. Murat Alstead, editor of the Cincinnati Gazette, went so far as to write downright lies in a letter to Secretary Salmon P. Chase. "How is it that Grant," he wrote, "who was behind at Fort Henry, drunk at Donelson, surprised at Shiloh, and driven back from Oxford, Miss., is still in command?'
 . . . the President wanted to find out for himself, and asked General John M. Thayer, a caller at the White House, "just in front of Vicksburg," to see him. "General," asked the President, "you have a man down there by the name of Grant, have you not?" "Yes, sir, we have, was the reply. "What kind of fellow is he," asked the President. Thayer replied that Grant was an excellent and popular commander with the army and had a stubborn determination to win under all circumstances. "Does Grant ever get drunk?" asked Mr. Lincoln bluntly. "No, Mr. President," replied Thayer, "Grant does not get drunk." "Is he in the habit of using liquor?" pressed the President. "I have seen him often, sometimes daily," was the reply, "and I have never noticed the slightest indication of his using any kind of liquor. The charge is atrocious, wickedly false. I saw him repeatedly during the battles of Donelson and Shiloh, on the field, Grant was one of them. . . . I am glad to bring this testimony to you in justice to a much maligned man." Mr. Lincoln then said: What I want is generals who will fight battles and win victories. Grant has done this and I propose to stand by him. . . .
 Much has been made if Grant's drinking, and his alleged prowess with the bottle has become legendary. Most of the so-called "facts" concerning this legend were originated by men who disliked Grant intensely because they found that they could not use him. At one time or another, these self appointed guardians of the public's morals incurred Grant's displeasure, and they turned to discrediting him by grasping at the first means at hand — a weakness they expanded all out of proportion. * * *
 Mr. Lincoln kept his word and stuck by his brilliant field commander. His own secretaries, John G, Nicolay and John Hay, noted that when busybodies and talebearers accused Grant of overindulgence, Lincoln would always reply, "If I knew the brand of whisky he drinks I would send a barrel or so to some other generals." Id. at 20, 21.
 S/ ________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ________________ JAMES J. BOOKER COMMISSIONER
S/ ________________ COY M. VANCE COMMISSIONER